# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION - CINCINNATI

RENEE ROBERTSON,            :    Case No. 1:18-cv-716

                       :

          Plaintiff,     :    Judge Matthew W. McFarland

                       :

    v.                 :

                       :

FINPAN, INC.,             :

                       :

         Defendant.    :

                       :

---

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DOC. 34)

---

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 34).[1] Plaintiff filed a Response in Opposition (Doc. 39), to which Defendant filed a Reply (Doc. 42), making this matter ripe for the Court's review. For the reasons below, Defendant's Motion (Doc. 34) is **GRANTED IN PART** and **DENIED IN PART**.

### FACTS

Of course, "[t]here are two sides to every story." *Rudolph v. Babinec*, 939 F.3d 742, 745 (6th Cir. 2019) (Thapar, J.). But not every story involves the graphic sexual content that is present here. So, viewer discretion is advised.

***Undisputed Facts***. Plaintiff Renee Robertson was hired by Defendant FinPan in

---

[1] Defendant initially filed its "First Motion for Summary Judgment" (Doc. 28), but subsequently filed the Amended Motion for Summary Judgment (Doc. 34) along with a Notice (Doc. 35) that Defendant "hereby remands" its Motion for Summary Judgment (Doc. 28). Accordingly, the Court will disregard Defendant's "First Motion for Summary Judgment" (Doc. 28) and only analyze the arguments raised in the Amended Motion for Summary Judgment (Doc. 34).

early 2017 to work in the National Sales and Marketing division. Shortly thereafter, she started a consensual sexual relationship with a co-worker, Stephen Confer, who held a similar position in the company. A few months later, however, Confer was promoted to Vice President and Robertson began reporting to him as her supervisor. Things were even more complicated since Confer was married. And eventually, Robertson and Confer's relationship ended over the course of a few weeks in January 2018. But sexual relations continued.

Robertson was nevertheless a good employee. In March 2018, FinPan promoted her to senior marketing director. She received a significant raise but was still supervised by Confer. It was also around this time that Robertson and Confer discontinued sexual relations. Although Robertson continued texting Confer about their relationship through at least mid-April, their last sexual encounter occurred on March 22, 2018.

Two months after her promotion, Robertson attended an industry trade show in Atlanta, Georgia along with several other FinPan employees—all but one of whom were her subordinates. During and after the trade show, the other employees contacted upper management to describe what they had witnessed of Robertson's behavior. On the first business day immediately following the trade show—Monday, May 14, 2018— FinPan fired Robertson for what it characterized as "inappropriate conduct."

The parties, however, tell two very different stories about the events leading up to Robertson's termination.

**_Robertson's Side of the Story_**. As an initial matter, it is important to note that

Robertson's statement of facts (*see* Doc. 39 at p. 1-3) is based entirely on citations to her own affidavit (*see* Doc. 41). Nevertheless, Robertson alleges as follows.

Starting in Fall 2017, Robertson became subjected to a hostile and sexualized work environment. Employees would circulate lewd and inappropriate images. The use of vulgar language, including the c-word, was common, including in meetings with senior management. Male employees would make graphic sexual comments about Robertson, other female employees, and women in general. And because Confer was married, Robertson suffered additional abuse and insults from other employees.

Things only got worse when her relationship with Confer ended. He became hostile towards her because she would no longer have sex with him. He sent her lewd and obscene messages, including a picture of his penis in bondage gear. He also made a number of hostile and chauvinistic remarks and attempted to retaliate against her in small ways (*e.g.*, ordering new office chairs for all staff members except her) and by spreading false and malicious rumors of a sexual nature about her (*e.g.*, that she was involved in swingers and sex clubs).

Robertson "approached" FinPan's CEO (Ryan Schaffer) and President (Jason Clear) with her concerns. (Doc. 41 at ¶ 10.) She also later met with the head of HR (Deborah Campbell) and "other management" in April 2018 to discuss Confer's conduct. (*Id.*) Yet no corrective action was taken. Campbell later told Robertson that she had a "target on her back." (*Id.*)

In May 2018, Robertson attended the Atlanta trade show, where she was allegedly subjected to graphic, lewd, and inappropriate statements and conduct by the

other employees. So, on the following Monday, Robertson came into work early with the intention of terminating some of those employees. She planned to meet with HR and CEO Ryan Schaffer to inform them of her plan. But before she could do so, Schaffer informed her that *she* was being fired. Robertson hired an attorney later that afternoon and subsequently filed the present lawsuit.

*FinPan's Side of the Story*. To quote Defendant, "[e]mployees of [ ] FinPan have stated in affidavits and depositions a different picture from the one portrayed by Robertson." (Doc. 34-1 at p. 3.) FinPan's side of the story deviates from Robertson's in two major ways.

First, FinPan describes a workplace environment that differs drastically from the one Robertson recalls. None of the other FinPan employees remember any graphic sexual comments, lewd jokes, or circulation of inappropriate images. And none of them recall any inappropriate behavior by Confer towards Robertson. President Jason Clear and CEO Ryan Schaffer both testified that Robertson never requested a meeting with either of them, never filed a formal complaint with HR, and never expressed concerns to them about Confer's promotion or his new supervisory role. Nor did they ever sense a change between Confer and Robertson's work relationship. Although Robertson indeed met with HR representative Deborah Campbell on multiple occasions, Campbell testified that she never complained about co-workers making lewd jokes or circulating inappropriate pictures. Campbell also had no idea Confer and Robertson were having a relationship until after it was over. Campbell further testified that no employees suspected that Robertson and Confer were involved in an intimate relationship and that

4

it did not affect Robertson's job performance.  When Robertson did inform Campbell of the relationship after it had ended, Robertson never expressed any concerns or issues that she had with Confer.  So, at Robertson's request, Campbell did not escalate the issue to upper management.

Second, the other FinPan employees who attended the Atlanta trade show agree that there was indeed a surplus of graphic, lewd, and inappropriate sexual statements and conduct.  But they allege, however, that Robertson was the perpetrator of that behavior—not the victim.

Jeff Ketterer and Joseph Shannon are members of FinPan's sales team and subordinates to Robertson.  Shannon (who was a new employee) and Ketterer (who reported directly to Robertson) both attended the Atlanta trade show and submitted signed affidavits describing what they witnessed.  (*See* Doc. 28-1 at p. 509-512.)  While there, Ketterer and Shannon went to lunch with Robertson.  All three were wearing FinPan clothing, including FinPan shirts.  During lunch, Robertson went on a "rampage" about another FinPan supervisor—Jeff Meyrose.  Robertson became very loud, to the point where people across the bar could hear her, and yelled "I'll cut his throat and shove his balls down his throat!"  (*Id.*)  In response, Shannon warned Robertson that her behavior could cost her her job.  Robertson then took out her phone; "stuck completely naked photographs of Steve Confer, in very compromising positions, in my face;" and exclaimed that she could not be fired because she "owned that dick." (*Id.*)  Robertson showed Ketterer and Shannon additional "photos of a man's penis in leather bondage devices.  She said they were of Steve Confer, but no face was shown."

(*Id.*) Ketterer also testified that Robertson told them a story about "how she got back at her first or second husband by bringing fifteen (15) guys back to her home and let them have their way with her." (*ld.*) There are additional detailed allegations of Robertson's alleged misconduct that, to summarize briefly, include: kissing a representative from a competitor company while still wearing FinPan attire, later bragging about how he subsequently left her hotel room wearing a FinPan hat, and stating to another co-worker about a passing female stranger that "[d]on't you wish your wife's boobs looked like that?" (*Id.*; Doc. 32 at 109-111.)

Ketterer called both President Jason Clear and CEO Ryan Schaffer and told them about Robertson's behavior. Schaffer, along with HR representative Deborah Campbell, investigated and followed up with each employee who attended the tradeshow. It is important to note that Confer was not involved in the investigation nor consulted about the decision to fire Robertson. (*See* Doc. 33 at 61: 2-11.) Afterwards, when Schaffer asked Campbell for her opinion, she responded "[i]mmediate dismissal." (Doc. 32 at 117: 4-15.) Campbell also testified that "[w]e tried to hear [Robertson]'s side of the story, but [she] blew up." (Doc. 30 at 110: 20-21.) When Schaffer told Robertson that she was fired, she replied, "I guess I will have to pull the trigger on everything I had prepared for this." (Doc. 32 at 129: 21-24.)

## LAW

Courts must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed.

R. Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To do so, the nonmovant must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland,* 585 F.3d 901, 913 (6th Cir. 2009). The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007). This requirement, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (*citing Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

## ANALYSIS

Robertson alleges three counts against FinPan: Count I for sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; Count II for retaliation under Title VII; and Count III for violations of Ohio Revised Code § 4112.02 and Ohio common law. Since Robertson asserts the same theories of relief under Ohio law as she does under Title VII (*see* Doc. 39 at p. 19), and because discrimination claims under Ohio law require the same analysis as Title VII claims, the Court analyzes both sets of claims together.[2]

---

[2] *See Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000) ("Because the elements and legal standards for establishing unlawful sex discrimination are the same under Ohio Rev.Code § 4112.02 and under [Title VII], we need not analyze [plaintiff's] sex discrimination claims separately under state and

As such, the Court will first determine whether FinPan is entitled to summary judgment on Robertson's claim for sexual harassment and then proceed to analyzing Robertson's claim for retaliation.

## I.  Sexual Harassment

Two types of sexual harassment claims are generally recognized: (1) "harassment that creates an offensive or hostile environment"; and (2) quid pro quo harassment, where "a supervisor demands sexual favors as a condition for job benefits." *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 628 (6th Cir. 2013) (citations omitted). Robertson alleges both.

### A.  Hostile Work Environment

To establish a hostile work environment claim based on sexual harassment, a plaintiff must show that:  (1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment created a hostile work environment, and (5) there is a basis for holding the employer liable. *Id.* at 629.

FinPan argues that summary judgment is warranted for two reasons:  (1) Robertson was not subjected to unwelcome sexual harassment nor a hostile work environment, and (2) there is no basis for employer liability since FinPan did not have knowledge of Robertson's harassment complaints.  Each argument is discussed below.

_____

federal law.") (internal citation omitted); *see also Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020 n.2 (6th Cir. 2000) (standards for Title VII are equally applicable to claims under Ohio Rev. Code § 4112).

(1)     **There is a Genuine Dispute as to Whether Robertson was Subjected to a Hostile Work Environment that was "Severe or Pervasive"**

Title VII and Ohio law protects employees from a "workplace permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "An objective and subjective test must be satisfied; 'in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim.'" *Stevens*, 533 Fed. Appx. at 629 (*quoting Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir.2006)). In making this determination, the court must look at the totality of the circumstances and consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 630 (citations omitted).

FinPan contends that Robertson cannot prove she was subjected to a hostile work environment—either objectively or subjectively. Its argument is thus two-fold. As to the objective prong, FinPan asserts that—apart from Robertson's own self-serving statements—there is no affirmative proof that FinPan's workplace was filled with severe or pervasive sexual conduct. As to the subjective prong, FinPan argues that (1) Robertson engaged in a consensual relationship with a co-worker and thus any sexual conversations with Confer were also consensual; and (2) Robertson, herself, perpetuated conversations based on sex. Meanwhile, Robertson asserts that not every

9

aspect of her relationship with Confer was completely consensual (specifically, after his promotion), and that she has provided sufficient evidence indicative of a hostile work environment. In response, FinPan reiterates that Robertson's evidence consists wholly of self-serving statements and, as such, should be disregarded.

True, the only evidence demonstrating severe and pervasive harassment (subjective or objective) comes from Robertson's own self-serving statements. This evidence consists of Robertson's (1) deposition testimony, (2) affidavit, and (3) notes that she made after her termination. Yet the Sixth Circuit has "repeatedly said that unsubstantiated, self-serving assertions will not preclude an adequately supported motion for summary judgment from being granted." *Mosquera v. MTI Retreading Co.*, 745 F. App'x 568, 573 (6th Cir. 2018) (collecting cases); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [summary judgment] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). FinPan thus urges the Court to disregard Robertson's self-serving statements and accept its side of the story as the only true version of events.

But that is not the Court's job. At the summary judgment stage, "the judge's function is not [for] himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. It is then the role of the jury—not the Court—to decide which version of events should be believed, based on the conflicting evidence presented at trial.

Moreover, "[a]t one level, all statements in litigation are self-serving." *Gresham v. Meden*, 938 F.3d 847, 850 (6th Cir. 2019) (Sutton, J.). And "[a]lthough perhaps not as

10

strong as some other evidence might be, self-serving statements can create a genuine dispute of material fact to be resolved at trial." *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) (Readler, J.). The question is if this is such a case.

Admittedly, FinPan's evidence is strong. Its motion is supported by sworn affidavits and deposition testimony from numerous employees that flatly deny any allegations of a sexualized workplace. But if believed, so is Robertson's—self-serving or not. Robertson describes a workplace in which she was sexualized and humiliated. Men often spoke to women in sexual demeaning fashion, talked about "rubbing up against them and their bodies at shows," and used the c-word in reference to female customers on "multiple occasions." (Doc. 39.) Robertson testified that she cried because another employee had referred to her breasts, noting, "[t]hat's how he introduced me to [new employees] when they came on their first day." (*Id.*) She observed employees circulate lewd and inappropriate images, such as a "cartoon with a nude woman with her legs spread open," and testified that an officer "sent out pornography to the company." (*Id.*) She also stated that this behavior was, at times, encouraged by management and supervisors at FinPan. And although FinPan asserts that it was "welcomed" and reciprocated as part of a consensual relationship, it is undisputed that Robertson's supervisor sent her a picture of his penis in bondage gear. Based on this evidence, a reasonable juror could find that Robertson was subjected to a "severe or pervasive" hostile work environment.

**(2)    There is a Genuine Dispute as to Whether FinPan had Knowledge of the Alleged Harassment**

FinPan also contends that there is no basis for employer liability because it did not know about the alleged harassment nor failed to act. President Jason Clear and CEO Ryan Schaffer both testified that Robertson never requested a meeting with either of them, never filed a formal complaint with HR, and never expressed concerns to them about Confer's promotion or his new supervisory role. Deborah Campbell, the head of HR, testified that she never received any complaints from Robertson about harassing behavior from co-workers and that she had no idea about Robertson and Confer's relationship until after it was over. She further testified that when Robertson did inform her of their relationship, she never expressed any concerns or issues that she had with Confer and requested that Campbell not escalate the issue to upper management.

Meanwhile, Robertson testified that she complained to HR (specifically, Deborah Campbell) on numerous occasions. She asserts that her first complaint to HR was in the winter of 2017 regarding the circulation of pornographic emails. (*see* Doc. 21 at 33: 18.) She also testified that she complained to CEO Ryan Schaffer about Confer's alleged harassment and "spoke to HR every day for months." (*Id*. at 26: 5—27: 5.) Furthermore, FinPan does not dispute that Campbell told Robertson she had a "target on her back."

As before, determining this dispute essentially boils down to a credibility contest between competing affidavits and testimony. The only way the Court can resolve this dispute is by deciding to believe FinPan's side of the story rather than Robertson's. But it is not the Court's role to determine which party is telling the truth and which party is

not—especially if the truth might actually lie somewhere in the middle. *See Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir.1990) ("such a credibility determination is inappropriate in ruling on a motion for summary judgment"). At minimum, Robertson has proffered evidence upon which a reasonable juror could find that FinPan had knowledge of the alleged sexual harassment.

In sum, Robertson has raised genuine disputes of material fact as to her hostile work environment claim, rendering summary judgment inappropriate.

### B. *Quid Pro Quo* Sexual Harassment

Although Robertson's first theory of liability survives summary judgment, her second theory does not. Under Title VII and Ohio law, an employer may not engage in *quid pro quo* sexual harassment, "which occurs when an employee's submission to unwanted sexual advances becomes either a condition for the receipt of job benefits, or the means to avoid an adverse employment action." *Palmer v. Cacioppo*, 429 F. App'x 491, 499 (6th Cir. 2011) (citation omitted). To prevail on such a claim, a plaintiff must prove: (1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors, (3) the harassment was based on her sex, (4) her refusal to submit to the unwelcome demands resulted in a tangible job detriment, and (5) the existence of employer liability. *Id.*

FinPan contends that it is entitled to summary judgment because Robertson is "unable to prove she was subjected to unwelcomed sexual harassment by her supervisor who made her submission an express or implied condition for receiving job benefits or that refusal resulted in a tangible job detriment." (Doc. 42 at p. 8.)

FinPan is correct.

As an initial matter, it is unclear whether Confer's sexual advances were, in fact, unwelcomed. "To determine whether a co-worker's sexual advances or requests are unwelcome, [courts] focus on the plaintiff's 'words, deeds, and deportment.'" *Souther v. Posen Const., Inc.*, 523 F. App'x 352, 355 (6th Cir. 2013) (*citing Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 69 (1986)). Here, it is undisputed that Robertson engaged in a consensual sexual relationship with Confer, who was her co-worker at the inception of said relationship. Nevertheless, Robertson's argument relies primarily on the fact that Confer sent her a picture of his penis in leather bondage gear. Yet Robertson admits that she sent intimate photos to Confer as well. (*See* Doc 21 at 163: 1-7.) The timing of the picture is also suspect. It appears that Confer sent it to Robertson sometime in January or February 2018. (*Id*. at 65: 8-14.) Although their relationship had "officially" ended by then, Robertson testified that their last sexual encounter occurred on March 22, 2018. Even after that, Robertson continued to send Confer texts about their relationship through at least early April. For example, on April 12, 2018, Robertson texted Confer the following: "I am still so crazy in love with you and in tons of pain . . .." (Doc. 21-1 at p. 3.) The next day, Robertson invited Confer to get drinks. (*Id*.) Confer did not respond to either text.

Regardless, even if Confer's sexual advances were unwelcomed, Robertson's claim still fails since there is no evidence that (1) such advances were made as an "express or implied condition for receiving job benefits," nor (2) "refusing to submit resulted in a tangible job detriment." *See Souther*, 523 F. App'x at 355 (*citing Highlander*

*v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir.1986)). First, Robertson never alleges that Confer's sexual advances were conditioned upon receiving any job benefit. Nor is there any evidence that demonstrates as much. In fact, Robertson was promoted and given a significant raise two months *after* she broke things off with Confer.

Second, there is no evidence that Robertson's refusal to submit to Confer's advances "resulted in a tangible job detriment." *Id*. To satisfy this element, Robertson must establish: "(1) a tangible employment action or detriment; and (2) a causal relationship between the tangible employment action and [Confer's] alleged actions." *Sanford v. Main Street Baptist Church Manor, Inc.*, 327 Fed. Appx. 587, 596-97 (6th Cir. 2009) (citation omitted). The Supreme Court has held, and the Sixth Circuit has reiterated, that a "tangible employment action" means "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Sanford*, 327 F. App'x at 597; *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1071 (6th Cir. 2015). Robertson contends that "her refusal to continue the sexual relationship with Confer resulted in her being subjected to hostile actions and ultimately [being] terminated." (Doc. 39 at p. 12.) However, there is no evidence that ties Confer's alleged actions to Robertson's termination. As discussed in more detail below, FinPan fired Robertson solely because of her misconduct during the Atlanta trade show. Confer did not attend the Atlanta trade show, was not involved in the subsequent investigation, and had no involvement in FinPan's decision to terminate Robertson's employment. Instead, that

15

decision was made by CEO Ryan Schaffer and the head of HR, Deborah Campbell.

In sum, Robertson's *quid pro quo* sexual harassment claim fails because there is no evidence that her refusal to submit to Confer's sexual advances resulted in an adverse employment action.

## II. Retaliation

Robertson's third and final theory of liability against FinPan is that she was fired in retaliation for reporting the alleged harassment. Because Robertson offers no direct evidence of retaliation, the Court applies the familiar *McDonnell-Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this three-step analysis, Robertson has the initial burden of establishing a prima facie case of retaliation. To do so, she must demonstrate that: (1) she engaged in activity protected under Title VII, (2) FinPan knew that she exercised her protected rights, (3) an adverse employment action was subsequently taken against her, and (4) Robertson's protected activity was the but-for cause of the adverse employment action. *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citations omitted). If Robertson can do so, then FinPan must articulate a legitimate, nondiscriminatory reason for its action. If FinPan does, then Robertson must demonstrate that FinPan's proffered reason was "mere pretext for discrimination." *Id.*

FinPan's argument is straight-forward: Robertson was fired solely because of her misconduct during the Atlanta trade show. As such, FinPan contends that it is entitled to summary judgment because Robertson cannot satisfy her initial burden of establishing a prima facie case, nor demonstrate pretext. Although FinPan raises

16

various arguments in support, the Court need only address two, both of which independently justify summary judgment.

First, Robertson cannot demonstrate pretext because FinPan's decision to fire her is protected under the "honest belief rule." Second, there is no causal connection between Robertson's relationship with Confer and her termination in May 2018.

## A. Robertson Cannot Demonstrate Pretext Because FinPan's Decision to Terminate Her Employment is Protected Under the "Honest Belief Rule"

Under the Sixth Circuit's adopted version of the "honest belief rule," an employer is entitled to summary judgment on pretext if it can demonstrate that it "has an honest belief in its proffered nondiscriminatory reason for discharging an employee," *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001), even if that reason is ultimately shown to be "mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (citation omitted). Under this rule, "an employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285-286 (6th Cir. 2012) (cleaned up). The employer's decision-making process need not "be optimal," nor must it leave "no stone [left] unturned." *Id.* "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

FinPan made such a "reasonably informed and considered decision" when it terminated Robertson. During the weekend of the Atlanta trade show, CEO Ryan

Schaffer and President Jason Clear fielded multiple calls from several employees

reporting that Robertson had engaged in inappropriate behavior. So, starting at 6:30

AM the following Monday, Schaffer, along with Deborah Campbell, began

investigating the allegations. (*See* Doc. 30 at p. 103-118 & Doc. 32 at p. 109-123.) They

arranged individual phone calls with each employee who attended the trade show—

five in total. These phone calls lasted for four to five hours (from 7:00 AM until around

11:00 AM/Noon). Campbell testified that, afterwards, she was "shocked,"

"flabbergasted," and "had to take a few minutes to decompress and pull myself

together." (*Id.*) Schaffer and Campbell then spoke with each other for an additional 20-

25 minutes to discuss potential courses of action. When Schaffer asked Campbell what

her opinion was, she responded, "[i]mmediate dismissal." (*Id.*) They then called

Robertson into the office and tried to hear her side of the story. But before they could

do so, Robertson "got explosive" and "blew up." (*Id.*) So, Schaffer informed Robertson

that she was fired. FinPan subsequently provided her with an Employee Disciplinary

Report, which stated that her termination was based on "Inappropriate Behavior" at the

"Trade Show – Atlanta Georgia." (Doc. 28-1 at p. 37.)

The most telling evidence as to why FinPan decided to fire Robertson comes

from the testimony of the person who ultimately made that decision—CEO Ryan

Schaffer. When asked what factors played a role, he testified as follows:

> A: I think the tipping points are you have a pattern of explosive behavior. . .
> where I [] watched her explode over very simple things, that pattern continuing
> out to a show being an external function but also crossing departmentally in
> terms of what she was doing from a marketing base versus the sales base, and
> then I think you see the active just kind of sexualization of other women to men

on the sales team, none of which felt appropriate. There were a couple of which even felt like, you know, they were reticent to say it, but they felt like they had been sexually harassed.

Q: Did they tell you that?

A: Yes, they did.

. . .

A: . . . the things that they felt like they had been shown or heard or had comments made by her, and again that includes the pictures at the bar and the comments made there.

Q: . . . for clarification . . . When you're referencing the pictures at the bar are you saying that the showing of those constituted grounds to you or that that was part of what you believe they felt harassed about?

A: The general feeling was it wasn't even so much the showing of the pictures. The showing of the picture made them feel harassed just that it was there, and then the real issue that I have is just the very -- There was a consistent report in between both Joey and Jeff Ketterer that she had really used it -- tried to display it to them as leverage that she was untouchable.

Q: Okay. But I'm asking you what were the specific grounds that made up your mind?

A: But that is the specific grounds because at the point where she says, you know, "I have got pictures and they can't fire me," to subordinate employees, both her own direct report and another manager's, you're getting into a territory from a management and leadership style that now you have got two different departments that you have affected and have, you know, eroded their own -- either their confidence in their manager or their confidence in you regardless of the outcome or purpose of that statement.

(Doc. 32 at p. 121: 11 – 123: 8.)

In short, Robertson was fired because FinPan "honestly believed" she had committed egregious misconduct at the Atlanta trade show. *Seeger*, 681 F.3d at 285. After receiving numerous allegations regarding Robertson's behavior, FinPan conducted a thorough investigation. Through the course of this investigation, FinPan

complied numerous "particularized facts" that corroborated the allegations. *Id.* FinPan

then relied on those facts in order to make a "reasonably informed and considered

decision." *Id.* The burden thus shifts to Robertson, who must demonstrate that

FinPan's belief was not honestly held.

      To rebut an employer's invocation of the honest belief rule, a plaintiff must

"show more than a dispute over the facts upon which the discharged was based." *Id.*

Instead, a plaintiff must provide "sufficient evidence to establish that the employer

failed to make a reasonably informed and considered decision before taking its adverse

employment action, thereby making its decisional process 'unworthy of credence,'

[such that] any reliance placed by the employer in such a process cannot be said to be

honestly held." *McLaughlin v. Fifth Third Bank, Inc.*, 772 F. App'x 300, 303 (6th Cir. 2019)

(*quoting Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)). Often this takes

the form of "evidence to the contrary" of the employer's honest belief, like "an error on

the part of the employer that is 'too obvious to be unintentional.'" *Blizzard v. Marion

Tech. College*, 698 F.3d 275, 286 (6th Cir. 2012) (*quoting Seeger*, 681 F.3d at 286).

      Robertson produces no such evidence. Instead, Robertson relies on (1) her own

deposition testimony where she flatly denies any allegation of misconduct;[3] (2) the

affidavit of third-party Ryan Carrasquillo, who testified that he did not observe any

"inappropriate conduct"[4]; and (3) her contention that "FinPan did not conduct any

---

[3] *See* Affidavit of Renee Robertson, Doc. 21 at p.22, 86: 20-21 (allegations of misconduct were "Absolutely one hundred percent false and incorrect on every level.")
[4] *See* Affidavit of Ryan Carrasquillo, Doc. 38 at ¶ 4.

investigation."[5]   All three fail.  The first two—Robertson's deposition testimony and the affidavit of Ryan Carrasquillo[6]—are used solely to dispute that she committed any misconduct.  But as stated above, the Sixth Circuit has expressly held that a plaintiff must "show more than a dispute over the facts upon which the discharged was based." *Seeger*, 681 F.3d at 285.  The third—Robertson's conclusory assertion that FinPan did not conduct any investigation—is flatly contradicted by the evidence on record.  As discussed above, FinPan has proffered substantial evidence of its investigation, which also further demonstrates that it was, in fact, quite thorough.  Any unfounded assertion to the contrary holds no credence.

Simply put, there is no genuine dispute as to why Robertson was fired:  FinPan conducted a thorough investigation which corroborated allegations that Robertson committed egregious misconduct while attending the Atlanta trade show.  Robertson fails to present any evidence that would demonstrate how FinPan's reasoning was not "honestly held," was "unworthy of credence," or that its decision was otherwise based on "an error that is too obvious to be unintentional." *Seeger*, 681 F.3d at 285.  FinPan is therefore entitled to summary judgment since Robertson cannot show that its nondiscriminatory reason for her termination was pretext.

**B.   Robertson Also Fails in Demonstrating Causation**

Although the Court has already found that FinPan is entitled to summary judgment on pretext, the Court notes that Robertson's retaliation claim independently

---

[5] Doc. 39 at p. 3, 14-19.
[6] Although FinPan argues that Cassaquillo's affidavit is improper and inadmissible, the Court refrains from making such a determination because the affidavit is irrelevant to the Court's analysis.

fails for a second reason—causation. The causation element of a Title VII retaliation claim requires Robertson to prove that her "protected activity" was the "but-for cause" of her termination. *Kenney v. Aspen Technologies*, 965 F.3d 443, 448 (6th Cir. 2020) (citations omitted). "Whether protected activity was the but-for cause of an adverse employment action depends upon the context in which that action occurs." *Id.*

As an initial matter, FinPan disputes that Robertson ever engaged in any "protected activity": she never filed a formal complaint with HR; she never complained of harassment to any supervisor or HR; and, on the one occasion she did discuss her relationship with Confer to Deborah Campbell, she ended the discussion and asked that management not be involved. Nevertheless, the Sixth Circuit has held that the "opposition clause" of Title VII's anti-retaliation provision "protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *New Breed Logistics*, 783 F.3d at 1067 (*quoting Laster*, 746 F.3d at 730). This broad interpretation includes, "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." *Id.* (*quoting Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 n. 8 (6th Cir. 2000). As discussed above, Robertson asserts that she complained to HR on "numerous occasions," starting as early at winter 2017. So here, at the summary judgment stage, there is at least enough evidence to draw the inference that Robertson engaged in a "protected activity," as broadly defined by the Sixth Circuit.

However, Robertson's vague allegations of what her protected activity precisely was, and when, specifically, she engaged in it, creates other problems. This is because

22

her causation argument relies predominantly on timing. She argues it is "suspicious" that she was fired just 53 days after she ended her relationship with Confer. (*See* Doc. 39 at p. 17) (Robertson "ended the relationship on March 22, 2018 . . . [but] was fired on May 14, 201[8]—53 days later.") Indeed, Robertson is correct that causation can be proven indirectly through circumstantial evidence such as suspicious timing. *See Lindsay v. Yates*, 578 F.3d 407, 418-420 (6th Cir. 2009) (collecting cases). The rest of her argument, however, is problematic.

First, Robertson calculates time from the date of her last sexual encounter with Confer—March 22, 2018. But having sex with your supervisor is certainly not "protected activity" under Title VII. Regardless, viewing the evidence in the light most favorable, the Court will presume that Robertson exercised a "protected activity" when she met with Deborah Campbell and "other management" in April 2018.

Yet Robertson's argument still fails. Although the Sixth Circuit has held that suspicious timing can be used to prove causation, it has also held—repeatedly—that "standing alone, temporal proximity generally is insufficient to establish causation." *Lisan v. Wilkie*, 835 F. App'x 831, 835 (6th Cir. 2020). Robertson must thus provide "other indicia to support a causal connection." *Aspen Tech.*, 965 F.3d at 449 (*citing Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (explaining that the absence of corroborative causal evidence undermines a theory of causation)). The only "corroborative causal evidence" Robertson has is that Deborah Campbell told her that she had a "target on her back." While the Court must view these two pieces of evidence in the light most favorable to Robertson, it must also consider the context in which her

23

termination occurred. *Aspen Tech.*, 965 F.3d at 448. So let's quickly recap the chronology of events.

In January 2018, Confer was promoted. Around this same time, Robertson and Confer decided to "officially" end their relationship. Yet they continued to have sexual relations until March 22, 2018. Also in March 2018, Robertson was promoted and received a significant raise. Deborah Campbell testified that Robertson's relationship with Confer never impacted her job performance. Sometime in April 2018, Robertson had a meeting with Campbell and "other management," and allegedly reported Confer's harassment. After the meeting, Campbell told Robertson that she had a "target on her back." Robertson continued to text Confer about their relationship through at least April 14, 2018. These texts included admissions of love and invitations to get drinks. One month later, Robertson attended the Atlanta trade show along with several coworkers. Because of her recent promotion, all but one of the coworkers were her subordinates. Robertson engaged in severe misconduct. She told her subordinates that she would slice the throat of one of FinPan's supervisors—Jeff Meyrose—and "shove his balls down his throat." Robertson then showed her subordinates very compromising pictures of another supervisor—Steve Confer—including a picture of his penis in bondage gear. When warned that her behavior might cost her her job, Robertson exclaimed that she could not be fired because she "owned that dick." Within 48-72 hours, FinPan investigated and decided that Robertson's behavior justified termination. This decision was based on both (1) her underlying misconduct and (2) the repercussions it would have/already had on her ability to manage and lead the sales

24

team. Moreover, apart from the graphic pictures that Robertson allegedly flaunted, Confer had no involvement in the Atlanta trade show, the subsequent investigation, or FinPan's decision to fire her.

All things considered, there is nothing "unusually suggestive" about the timing of Robertson's termination. *See Aspen Tech.*, 965 F.3d at 449. And the fact that Deborah Campbell told Robertson she had a "target on her back," amounts to nothing more than a mere "scintilla" of evidence that is insufficient to rebut the overwhelming evidence proffered by FinPan. *Anderson*, 477 U.S. at 252.

Last, and perhaps most important, the Sixth Circuit has held that an "intervening legitimate reason" between the protected activity and the adverse employment action "dispels any inference of causation . . . [and] undermines any suggestion of retaliation based on temporal proximity." *Wilkie*, 835 F. App'x at 835; *see also Aspen Tech.*, 965 F.3d at 450. The record here reflects that Robertson's behavior at the Atlanta trade show qualifies as such an intervening cause and justifies her termination. Robertson's retaliation claim thus fails on this ground as well. *Id.*

In short, no reasonable juror could find that Robertson was fired in retaliation for exercising a "protected activity" under Title VII.

## CONCLUSION

For the reasons above, FinPan's Motion for Summary Judgment (Doc. 34) is **GRANTED IN PART** and **DENIED IN PART**. FinPan is entitled to summary judgment on Robertson's claims for *quid pro quo* harassment under Title VII (Count I) and Ohio law (Count III), and retaliation under Title VII (Count II) and Ohio law (Count III), which are hereby **DISMISSED WITH PREJUDICE**. Robertson's claims for hostile work environment under Title VII (Count I) and Ohio law (Count III) remain pending before the Court.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND